# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3026

_____

Midwest Regional Allergy, Asthma, Arthritis & Osteoporosis Center, P.C., a
Missouri Corporation; Dr. Michael Joseph, Individually

*Plaintiffs - Appellees*

Sooner Three, LLC

*Plaintiff*

v.

The Cincinnati Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: April 16, 2015
Filed: July 31, 2015

_____

Before WOLLMAN and GRUENDER, Circuit Judges, and GRITZNER,[1] District
Judge.

_____

---

[1]The Honorable James E. Gritzner, Senior United States District Judge for the
Southern District of Iowa, sitting by designation.

GRITZNER, District Judge.

The Cincinnati Insurance Company (Cincinnati Insurance) appeals the order of the district court[2] granting summary judgment in favor of Midwest Regional Allergy, Asthma, Arthritis & Osteoporosis Center, P.C. (Midwest Regional), and Dr. Michael Joseph. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

Dr. Joseph operates Midwest Regional in Joplin, Missouri. Since at least 2009, Midwest Regional used specialized medical equipment as part of its normal business operations, including a magnetic resonance imaging (MRI) machine, an X-ray machine, a bone density scanner, laboratory analysis equipment, and specialty infusion equipment. On May 22, 2011, a tornado struck Midwest Regional's medical practice located at 1727 W. 26th Street in Joplin (the Premises). The tornado substantially damaged the building and its contents, rendering it inoperable for medical practice. The tornado damaged Midwest Regional's MRI machine and destroyed the other specialized medical equipment.

After the tornado, Dr. Joseph decided to permanently relocate his medical practice to the Gryphon Building in Joplin (the Replacement Location). The Replacement Location required substantial construction before Midwest Regional could begin its operations. Until construction was complete, Midwest Regional operated out of a temporary location in Webb City, Missouri (the Temporary Location). Midwest Regional, however, was unable to operate at its normal business capacity while at the Temporary Location. Midwest Regional did not accept new patients, and it operated at a reduced schedule. In part because of space restrictions, Midwest Regional did not install the MRI machine, X-ray machine, bone density

_____

[2]The Honorable Greg Kays, Chief United States District Judge for the Western District of Missouri.

scanner, or infusion equipment at the Temporary Location and did not receive any revenue from such services.

In preparation to move into the Replacement Location, Midwest Regional repaired the MRI machine and replaced the destroyed X-ray machine, bone density scanner, laboratory analysis equipment, and specialty infusion equipment (collectively, other specialty equipment). Moving the repaired MRI machine to the Replacement Location required a crane and the special expertise of the machine's manufacturer. In addition, the Replacement Location required substantial modification in order to house the MRI and X-ray machines. Among other things, it was necessary to reinforce the floors with concrete, remove and replace exterior brick, as well as install pipe, specialized heating and air conditioning equipment, and copper shielding in the walls, door, and ceiling. The Replacement Location opened on May 1, 2012, slightly less than one year after the tornado.

The Premises was insured by a business owner's policy issued by Cincinnati Insurance (the Policy). Cincinnati Insurance paid Midwest Regional the policy limit of $2,414,161.26 for the building loss, and the policy limit of $388,000 for Midwest Regional's business personal property loss. In addition, Cincinnati Insurance paid $828,081.75 for business income interruption and extra expenses. The parties agree that Cincinnati Insurance paid the full amount of business income loss. Under the "Extra Expense" provision, Cincinnati Insurance reimbursed Midwest Regional for office computer equipment, other medical equipment, office equipment and furniture, and other miscellaneous property.

Midwest Regional subsequently requested reimbursement under the Extra Expense provision for the costs to repair and relocate the MRI machine and to replace the other specialty equipment necessary to resume the normal operations of the medical practice. Cincinnati Insurance denied payment for the additional expenses contending the expenditures did not fall under the Extra Expense provision.

Cincinnati Insurance contended the expenses were losses covered under the Building or Business Personal Property provisions, for which Midwest Regional was paid the policy limits.

Midwest Regional filed suit against Cincinnati Insurance alleging it was entitled to reimbursement for the repair and relocation of the MRI machine and the replacement of the other specialty equipment under the Extra Expense provision. On cross motions for partial summary judgment, the district court granted partial summary judgment in favor of Midwest Regional and against Cincinnati Insurance. The district court found the claimed expenses were recoverable under the Extra Expense provision, and alternatively, the Policy was ambiguous and therefore should be read as providing coverage. The parties subsequently entered into a consent judgment as to the loss amount, and Cincinnati Insurance reserved its right to appeal the summary judgment order. This appeal followed.

## II.

"We review both the district court's grant of summary judgment and its interpretation of the insurance policy *de novo*." United Fire & Cas. Co. v. Titan Contractors Serv., Inc., 751 F.3d 880, 883 (8th Cir. 2014). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Because federal jurisdiction in this case is based on diversity of citizenship, state law controls the interpretation of the Policy." DeAtley v. Mut. of Omaha Ins. Co., 701 F.3d 836, 838 (8th Cir. 2012). There is no dispute that Missouri substantive law controls. Under Missouri law, the interpretation of an insurance policy is a question of law. Schmitz v. Great Am. Assurance Co., 337 S.W.3d 700, 705 (Mo. 2011). "[T]he insured bears the burden of proving coverage under an insurance policy," and the insurer bears the burden of proving the applicability of any exclusion

-4-

from coverage.  Fischer v. First Am. Title Ins. Co., 388 S.W.3d 181, 187 (Mo. Ct. App. 2012) (citation omitted).  When construing an insurance policy, courts must apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance."  Allen v. Cont'l W. Ins. Co., 436 S.W.3d 548, 553-54 (Mo. 2014) (internal quotation marks and citation omitted).

The general rules of contract interpretation apply to insurance contracts as well. Todd v. Mo. United Sch. Ins. Council, 223 S.W.3d 156, 160 (Mo. 2007).  "A contract must be construed as a whole so as to not render any terms meaningless, and a construction that gives a reasonable meaning to each phrase and clause and harmonizes all provisions is preferred over a construction that leaves some of the provisions without function or sense."  State ex rel. Riverside Pipeline Co., L.P. v. Pub. Serv. Comm'n, 215 S.W.3d 76, 84 (Mo. 2007).  "When a provision of a contract deals with a specific situation, it will prevail over a more general provision if there is ambiguity or inconsistency between them."  Five Star Quality Car-MO, L.L.C. v. Lawson, 283 S.W.3d 811, 815 (Mo. Ct. App. 2009).

If an insurance policy is unambiguous, we must enforce the policy as written. Allen, 436 S.W.3d at 553-54.  If the policy is ambiguous, however, any ambiguity must be resolved against the insurer-drafter.  Id. at 554.  "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy," or if the policy "is reasonably open to different constructions."  Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. 2007) (quoting Gulf Ins. Co. v. Noble Broad., 936 S.W.2d 810, 814 (Mo. 1997)).

At issue is the application of section k, the Extra Expense provision, under the Additional Coverages section of the Policy.  The Court must begin with analyzing the written language of the Policy.  Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co., 62 S.W.3d 633, 637 (Mo. Ct. App. 2001).  The Extra Expense provision states:

**SECTION I – PROPERTY, D.  Deductibles** does not apply to this Additional Coverage.

**(1)**    We will pay the necessary Extra Expense you incur during the "period of restoration" caused by or resulting from a Covered Cause of Loss that you would not have incurred if there had been no direct physical "loss" to property at the "premises", including personal property in the open, or in a vehicle within 1,000 feet of the "premises".

**(2)**    Extra Expense means expense you incur:

**(a)**    To avoid or minimize the "suspension" of business and to continue "operations":

**1)**    At the "premises"; or

**2)**    At a replacement location or a temporary location, including:

**a)**    Relocation expenses; and

**b)**    Costs to equip and operate the replacement or temporary location;

**(b)**    To minimize the "suspension" of business if you cannot continue "operations";

**(c)**    To:

**1)**    Repair or replace any property; or

**2)**    Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or **SECTION I - PROPERTY, A. Coverages, 5. Additional Coverages, c. Business Income.**

If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the salvage value of that property shall be taken into consideration in the adjustment of the loss.

**(3)**    We will only pay for Extra Expense that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical "loss".

This Additional Coverage – Extra Expense, is not subject to the Limits of Insurance.

J.A. 112-13.

It is undisputed that the claimed expenses were caused by a covered cause of loss and that those expenses would not have been incurred absent the damage to the Premises. The claimed expenses were also incurred during the period of restoration[3] and within twelve consecutive months from the date of loss. Therefore, the only issue in determining whether the expenses are recoverable under the Extra Expense provision is whether the expenses meet the definition of "Extra Expenses" under subsection k(2).

The district court found the claimed expenses met the definition of extra expenses under subsection k(2)(a). We agree this is a reasonable reading of the provisions. Subsection k(2)(a) provides extra expense coverage "to avoid or minimize the 'suspension' of business and to continue 'operations' . . . [a]t a replacement location . . . ." J.A. 112. It is undisputed that prior to the tornado, Midwest Regional's normal business operations included providing MRIs, X-rays, bone density scans, full laboratory analysis, and specialty infusion services. While operating at the Temporary Location, Midwest Regional was unable to offer such services and suffered a direct loss of business income as a result. The MRI machine and other specialty equipment were therefore necessary for Midwest Regional to avoid the

---

[3]"Period of restoration" is defined under the Policy as the period of time that:

(1) Begins at the time of direct physical 'loss'; and

(2) Ends on the earlier of:

    (a)    The date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

    (b)    The date when business is resumed at a new permanent location.

J.A. 139.

continued cessation or slowdown of the business and to resume normal business operations at the Replacement Location.

Expenses covered under subsection k(2)(a) include "relocation expenses" and "costs to equip and operate the replacement or temporary location." Midwest Regional sought reimbursement for three specific expenses: repair of the MRI machine, replacement of the other specialty equipment, and installation of the MRI machine. Considering the Policy as a whole and reading all provisions in harmony, it is a reasonable construction that the repair of the MRI machine and the replacement of the other specialty equipment were costs to equip and operate the Replacement Location. It is similarly reasonable to construe the installation expenses associated with the MRI machine as costs to relocate the business to the Replacement Location. Although the nature of Midwest Regional's business and the extent of the damage necessitated substantial relocation expenses and significant costs to equip and operate the Replacement Location, this is not a factor in determining whether coverage exists under the Extra Expense provision of the Policy.

Cincinnati Insurance argues the claimed expenses are not recoverable under subsection k(2)(a) because such expenses do not reduce the amount of loss recoverable under the Policy's Business Income provision. However, a plain reading of the Policy reveals that only extra expenses recoverable under section k(2)(c) are required to lessen or mitigate losses otherwise payable under the Extra Expense provision or the Business Income provision. Extra expenses under subsections k(2)(a) and k(2)(b) are not connected to the Business Income provision.

Because the claimed expenses are recoverable under subsection k(2)(a), the Court finds it is unnecessary to discuss whether the claimed expenses may also fall under subsections k(2)(b) or k(2)(c). Under the plain language of the Policy, an ordinary person of average understanding in the insured's position would interpret the three definitions of extra expenses in section k(2) as distinct and separate. There is

no connecting language between subsections k(2)(a), k(2)(b), and k(2)(c), and therefore they are each construed independently. Furthermore, a plain reading of each subsection reveals they apply in separate and distinct scenarios. The first two subsections apply to avoid or minimize the suspension of business operations when business operations are continued, subsection k(2)(a), or when the business operations cannot presently continue, subsection k(2)(b). The third definition of extra expenses in subsection k(2)(c) is not connected to expenses necessary to avoid or minimize the suspension of the business, but rather provides coverage to specific expenses that reduce losses otherwise payable under the Extra Expense and Business Income provisions.

Cincinnati Insurance further argues Midwest Regional is prohibited from reimbursement for the claimed expenses because the expenses are covered under the Building and Business Personal Property provisions of the Policy, in which Cincinnati Insurance paid the policy limits. Cincinnati Insurance argues the Extra Expense provision is a separate and distinct provision and Midwest Regional cannot use the Extra Expense provision to circumvent the policy limits of the Building and Business Personal Property provisions.

The reliance by Cincinnati Insurance on our decision in Polytech, Inc. v. Affiliated FM Insurance Co., 21 F.3d 271 (8th Cir. 1994), in support of this argument is misplaced. In Polytech we held a business income interruption policy, not an extra expense provision, was a separate and distinct type of insurance under Missouri's valued policy statute. Id. at 275. We did not address how an extra expense provision relates to other property coverages under a similar insurance policy. Polytech, therefore, has no relevant application. The other cases Cincinnati Insurance cites, most of which are unpublished and from other jurisdictions, similarly do not illuminate the specific issue in dispute. See Galvan v. Amco Ins. Co., No. CIV S-10-2257-GEB-CMK, 2011 WL 3882497, at * 5-6 (E.D. Cal. Sept. 2, 2011) (denying extra expense coverage under the first two definitions of extra expenses because the

insured terminated, as opposed to suspended, its business operations, and the expenses did not meet the third definition because the expense did not reduce losses otherwise payable under the extra expense provision or business income provision); <u>Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co.</u>, No. Civ.A. 00C-05-034, 2003 WL 21223843, at *3 (Del. Super. Ct. April 17, 2003) (denying coverage under the extra expense provision for reconstruction expenses for a rented building, such as lighting and other fixtures, because such expenses were exclusively covered by the property provision); <u>Thompson v. Threshermen's Mut. Ins. Co.</u>, 493 N.W.2d 734, 737 (Wis. Ct. App. 1992) (holding extra expense coverage for the construction of a new building when the insured previously rented the building contravened the parties' intent).

Cincinnati Insurance ignores the fact that the language of the Policy does not specifically exclude coverage under the Extra Expense provision if the expenses happen to fall under another coverage in the Policy. Rather, the Policy specifically states that Extra Expense coverage is not subject to the policy limits. <u>See</u> <u>Mansion Hills Condo. Ass'n</u>, 62 S.W.3d at 637 ("When the language of an insurance contract is unambiguous then rules of construction are inapplicable and, absent a public policy exception to the contrary, the contract must be enforced as written." (citation omitted)). Given the lack of a clear indication in the Policy to the contrary, an ordinary person in the position of the insured would understand the disputed provision to provide coverage for the expense at issue. The Court therefore finds the Policy, as written, covers the claimed expenses under the Extra Expense provision.

The judgment of the district court is affirmed.

_____